No. 25-1516

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

AVANRU DEVELOPMENT GROUP, LTD.

Plaintiff – Appellant,

v.

TOWN OF SWANZEY, NH, Zoning Board of Adjustment and Planning Board; ANN KARASINSKI, Zoning Board of Adjustment member, in both the individual and official capacities; ADAM MULHEARN, Zoning Board of Adjustment member, in both the individual and official capacities; BRYAN RUDGERS, Zoning Board of Adjustment member, in both the individual and official capacities; ROBERT MITCHELL, Zoning Board of Adjustment member, in both the individual and official capacities; RICHARD LANE, Planning Board member, in both the individual and official capacities; JANE JOHNSON, Planning Board member, in both the individual and official capacities; STEVE MALONE, Planning Board member, in both the individual and official capacities; SYLVESTER KARASINSKI, Planning Board member, in both the individual and official capacities; MATTHEW BACHLER, Director of Planning & Economic Development, in the former official capacity,

Defendants – Appellees.

_____

On Appeal from the United States District Court for the
District of New Hampshire

_____

**BRIEF OF APPELLANT
AVANRU DEVELOPMENT GROUP, LTD.**

Counsel for Appellant:
Robert H. Miller (Bar No. 6578)
James P. Harris (Bar No. 100058)
Sheehan Phinney Bass & Green, P.A.
1000 Elm Street, Manchester, NH 03105-3701
(603) 627-8145; (603) 627-8152
rmiller@sheehan.com; jharris@sheehan.com

**Appellant Avanru Development Group, Ltd.'s**
**Disclosure Statement**
**Fed. R. App. P. 26.1**

Appellant Avanru Development Group, Ltd. respectfully submits the

following Disclosure Statement pursuant to Fed. R. App. P. 26.1:

The filing party, Avanru Development Group, Ltd., has no parent.

There is no publicly held corporation that owns a 10% or more

membership or stock interest in the filing party, or a publicly held

corporation with which a merger agreement exists.

Respectfully submitted,

AVANRU DEVELOPMENT
GROUP, LTD.

By its counsel,

Dated: August 27, 2025

By: _/s/ James P. Harris_____
Robert H. Miller (Bar No 6578)
James P. Harris (Bar No. 100058)
Sheehan Phinney Bass & Green, P.A.
1000 Elm Street, P.O. Box 3701
Manchester, NH 03105-3701
603-627-8145; 603-627-8152
rmiller@sheehan.com
jharris@sheehan.com

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................iv

STATEMENT FOR ORAL ARGUMENT ............................................ vii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............. 2

STATEMENT OF THE CASE .................................................................. 2

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT .............................................................................................. 7

I. **The District Court Improperly Dismissed Appellant's Equal Protection Claim** ................................................................ **7**

    A. *SBT Holdings* Favors Appellant and Militates Against Dismissal ....................................................................... 7

    B. The District Court Did Not Properly Apply the Standard Applicable to a Motion to Dismiss ....................... 14

    C. There Are Many Ways to Prove an Equal Protection Claim.. 19

II. **The District Court Improperly Dismissed Appellant's Substantive Due Process Claim** ............................................... **22**

    A. Fundamental Procedural Irregularities Pervade Appellant's Complaint ................................................................... 22

    B. The Standard in this Circuit is Markedly Higher than in Other Circuits ................................................................... 26

    C. The Justification for this Circuit's Higher Standard Is Absent on These Facts ................................................................... 31

III. **Standard of Review** ............................................................... **34**

CONCLUSION ......................................................................................... 34

CERTIFICATE OF COMPLIANCE ....................................................... 35

CERTIFICATE OF SERVICE ................................................................. 36

BRIEF ADDENDUM .......................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

*A.B.C. Home Furnishings v. Town of E. Hampton*, 964 F. Supp. 697, 703 (E.D.N.Y. 1997) ...............................................................................................16

*Albery v. Redding*, 718 F.2d 245, 251 (7th Cir. 1983).................................................30

*Anthony v. Franklin,* 799 F.2d 681, 684 (11th Cir.1986) ........................................32

*Barrington Cove, Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1 (1st Cir. 2001)................................................................................................21

*Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988).........................................34

*Bourne v. Town of Madison*, 494 F. Supp. 2d 80 (D.N.H. 2007)...........................37

*Brady v. Colchester*, 863 F.2d 205, 215 (2d Cir. 1988) .........................................35

*Brockton Power, LLC v. City of Brockton,* 948 F. Supp. 2d 48 (D.Mass. 2013) ....20

*CEnergy-Glenmore Wind Farm #1, LLC v. Town of Glenmore*, 769 F.3d 485, 488 (7th Cir. 2014) ...........................................................................................31

*Chiplin Enters. v. City of Lebanon*, 712 F.2d 1524 (1st Cir. 1983)........................28

*Clark v. Boscher,* 514 F.3d 107, 114 (1st Cir. 2008)...............................................16

*Cloutier v. Epping*, 714 F.2d 1184 (1st Cir. 1983) .................................................24

*Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822 (1st Cir. 1982).................... passim

*Crocker v. Hakes*, 616 F.2d 237 (5th Cir. 1980) ...................................................24

*Del Monte Dunes v. Monterey*, 920 F.2d 1496 (9th Cir. 1990)..............................34

*Gilmere v. City of Atlanta, Ga.*, 774 F.2d 1495, 1498 (11th Cir. 1985)..................38

*Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir. 1982) ......................31

*Hous. Works v. Turner*, 179 F. Supp. 2d 177, 200 (S.D.N.Y. 2001)........................17

*Kadar Corp. v. Milbury*, 549 F.2d 230 (1st Cir. 1977)..................................... 24, 28

*Khater v. Sullivan*, 160 N.H. 372 (2010) ...............................................................37

*Paterek v. Vill. of Armada*, 801 F.3d 630, 648 (6th Cir. 2015) ...............................33

*Pearson v. Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992) .........................................33

*Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995) ...................................... 19, 20, 21

*Rutherford v. City of Berkeley*, 780 F.2d 1444, 1447 (9th Cir. 1986).....................38

*SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008)...... passim

*Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983) ............................... 29, 30

*Scudder v. Town of Greendale*, 704 F.2d 999, 1002 (7th Cir. 1983) .......................30

*Shelton v. Coll. Station*, 780 F.2d 475, 482 (5th Cir. 1986) ...................................29

*Southern Cooperative Development Fund v. Driggers*, 696 F.2d 1347, 1356 (11th

   Cir.), *cert. denied*, 463 U.S. 1208, 77 L. Ed. 2d 1389, 103 S. Ct. 3539 (1983)...32

*Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989).....................................31

*UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003).......29

*United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216-17 (2d Cir. 1987), *cert.*

   *denied*, 486 U.S. 1055, 100 L. Ed. 2d 922, 108 S. Ct. 2821 (1988) ....................17

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 145 L. Ed. 2d 1060, 120 S. Ct.

1073 (2000)...................................................................................... 15, 16, 19

*Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983).......................................33

**Statutes**

28 U.S.C. §1291 ...........................................................................................1

28 U.S.C. §1331 ...........................................................................................1

28 U.S.C. §2201 ...........................................................................................1

28 U.S.C. §2202 ...........................................................................................1

42 U.S.C. §1983 ................................................................................... 1, 6, 31

**United States Constitution**

Fourteenth Amendment to the United States Constitution .........................................1

## **<u>STATEMENT FOR ORAL ARGUMENT</u>**

Pursuant to Fed. R. App. P. 34(a), Appellant respectfully submits that oral argument would aid the Court, particularly with respect to examining how the standard for a violation of a plaintiff's right to substantive due process in this Circuit compares to the standard applied in other Circuits and the lack of an available state-court remedy.  *See* Pts. II.B-C, *infra*.

# JURISDICTIONAL STATEMENT

The District Court's subject matter jurisdiction was based on 28 U.S.C. §1331 because the case arises under the Fourteenth Amendment to the United States Constitution and the Civil Rights Act, 42 U.S.C. §1983. Declaratory relief was sought pursuant to 28 U.S.C. §2201 and 28 U.S.C. §2202.  Appellant alleges violations of its rights to equal protection and substantive due process, rights afforded by the Fourteenth Amendment to the United States Constitution.  42 U.S.C. § 1983 provides a civil cause of action for individuals whose rights have been violated by state officials such as Appellees.

This Court's jurisdiction stems from 28 U.S.C. §1291, because this appeal is of a final decision of a district court.

Under Fed. R. App. P. 4(a)(1)(A), a notice of appeal as of right "must be filed with the district court within 30 days after entry of judgment or order appealed from."  The district court entered the appealed-from order on April 10, 2025 (Addendum ("Add.") 38) and entered judgment on May 6, 2025.  Appendix ("App.") 9.  Appellant's notice of appeal was filed on May 8, 2025.  Add. 70.

The order appealed-from granted Appellees' motion to dismiss and is therefore a final order or judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the District court properly granted Appellees' motion to dismiss Appellant's claims that its rights to equal protection and substantive due process under the Fourteenth Amendment to the United States Constitution were violated.

## STATEMENT OF THE CASE

This case is brought by Appellant, Avanru Development Group, Ltd. ("Avanru"), which sought to develop two residential projects in the Town of Swanzey, New Hampshire, an age-restricted, affordable housing project (the "Airport Project") and a separate workforce housing project (the "West Swanzey Project"). With respect to the Airport Project, the case centers on an initial denial of a special exception by the Swanzey Zoning Board of Adjustment ("ZBA") and subsequent proceedings before the Swanzey Planning Board in which Appellees forced costly concessions upon Appellant. With respect to the West Swanzey Project, the case focuses on proceedings before the Planning Board where again costly changes to the project were required by Appellees.

The facts alleged in the Complaint show that Appellant was treated differently than other similarly situated developers and projects. Appellees obstructed Appellant's projects while other nearly identical projects were not

subject to the same scrutiny and avoided the costly conditions imposed only on Appellant – in violation of Appellant's right to equal protection. The Complaint also demonstrates that Appellees acted arbitrarily and irrationally during the approval processes for Appellant's projects – in violation of Appellant's right to substantive due process.

Appellant filed a complaint in the United States District Court for the District of New Hampshire on April 16, 2024. App. 4 (docket report). Appellees filed a motion to dismiss on July 15, 2024. App. 8. Appellant filed an objection to the motion to dismiss on September 12, 2024. *Id*. Appellees filed a reply on October 3, 2024. App. 9. Appellant filed a surreply on October 8. 2024. *Id*. The District Court issued a written decision granting Appellees' motion to dismiss on April 10, 2025, without conducting a hearing on the motion. *Id*. The District Court entered judgment on May 6, 2025. *Id*. Appellant appeals to this Court for reversal.

## SUMMARY OF ARGUMENT

This is not the "run of the mill" complaint filed by a developer whose project was denied approval by a municipality. In this case, Appellees approved other projects that were nearly identical to Appellant's in all meaningful respects (building size, lot size, density, height, appearance, neighborhood, etc.) in the months just before and just after Appellees denied

Appellant's projects. The Town of Swanzey, New Hampshire, acting through its ZBA and Planning Board, unreasonably singled out Appellant's age-restricted, affordable housing project (the "Airport Project") and its other workforce housing project ("Swanzey West") subjecting Appellant to arbitrary and unreasonable conditions not previously or subsequently imposed on any other developer in the Town of Swanzey.  Appellant had to fight for approvals, reverse the unlawful denial of its application for a special exception from the ZBA, endure years of delay, and make costly design changes that no other similarly-situated developer in the Town of Swanzey has *ever* faced.  Members of both the ZBA and the Planning Board, on and off the record, openly admitted their animus for Appellant's proposed affordable senior housing project, and even acknowledged that Appellant was being treated differently than other developers.

The ways in which Appellant was treated differently are specified in the Complaint, but they include: Planning Board members (1) imposed requirements on Appellant that are not contained in the Planning Board regulations; (2) invented new tests to impermissibly reduce the size and scope of Appellant's project; (3) arbitrarily and capriciously insisted on changes to project designs that were not required by the regulations in order to reduce the project size, force the project to require variances, and impose significant

additional design costs; (4) openly ignored advice from the Town's legal counsel; (5) brazenly admitted to engaging in *ex parte* communications outside of the public hearing and after the public hearing was closed, and using the information gathered to justify voting against Appellant's project and encouraging other Planning Board members to do the same; and (6) re-defined their roles, on the record, as "doing the will of the voters," as opposed to evaluating projects based on the applicable regulations.

Avanru fought and ultimately overcame the many obstacles placed in front of it to finally obtain all of its required approvals, but not before being forced to endure over three years of delay, an appeal to the New Hampshire Supreme Court that should never have been required (after decisively prevailing in Superior Court), and millions of dollars of additional development and delay costs that it would not have incurred had the project been approved in a manner consistent with the applicable regulations, and in keeping with the way the Appellees approved similarly-situated projects. Appellant therefore seeks redress for repeated violations of its right to equal protection and substantive due process.

The District Court improperly dismissed Appellant's Complaint. Appellant's case closely mirrors the allegations of *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008), a dismissal this Court reversed.

The District Court made determinations of Appellees' intent that were contrary to the facts and record supplied in the Complaint, somehow ascribing to Appellees a non-nefarious state of mind, thereby invading the role of a finder of fact after receiving evidence. After putting its own gloss on Appellees' state of mind, the District Court focused too myopically on that one potential path to proving a violation of the right to equal protection, to the exclusion of the other ways in which that claim can be presented and that were alleged in the Complaint.

The District Court also overlooked the essence of substantive due process, which is protection against fundamental procedural irregularities employed to deprive a landowner of its rights. Appellant's Complaint chronicles that the ZBA and Planning Board created entirely new standards just to derail Appellant. This case also presents a unique opportunity for this Court, which has established a standard for due process claims that is much more stringent than in other Circuits. When this Court established its standard, it assumed that state remedies would provide adequate protection for developers, such that federal courts should avoid stepping in. However, New Hampshire lacks the equivalent of 42 U.S.C. §1983, so if this Court will not enforce Appellant's federally-protected constitutional rights, Appellant is left without a remedy. Respectfully, this Court should re-examine its approach to substantive

due process claims, at least as presented on these facts. The result should be a reversal of the District Court's granting the motion to dismiss.

## ARGUMENT

### I. The District Court Improperly Dismissed Appellant's Equal Protection Claim.

#### A. *SBT Holdings Favors Appellant and Militates Against Dismissal.*

The District Court grounded its dismissal of Appellant's equal protection claim on *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28 (1st Cir. 2008). Notably, this Court reversed the dismissal of that plaintiff's complaint. *Id*. at 35 ("The district court erred in dismissing the plaintiffs' complaint for failure to state a claim."). This Court found that SBT's allegations of defendants' efforts to cause the plaintiff's financial demise were sufficient indicators of a malicious or bad faith intent to injure.

In *SBT*, the municipality's conservation commission knew that the property was subject to an administrative order issued by the state's Department of Environmental Protection that governed response to an environmental issue on the property, but the local commission nevertheless imposed onerous conditions of its own that contradicted the state agency's order. *Id*. at 30-31. The conservation commission's costly conditions were issued at a time when the commission knew it could not impose them without violating state law. *Id*. at 31. When SBT and the state agency entered into a consent order, the

conservation commission again instructed SBT to take steps that contradicted that order, even though state law afforded the state agency authority over the matter. *Id*. The municipal commission ultimately issued cease and desist orders. *Id*. SBT's lenders pulled their funding for the project and the owners of SBT were required to spend their own funds, while enduring delays and cost overruns. *Id*. Several state-court lawsuits followed, including one in which the municipality obtained preliminary injunctive relief delaying the project further. *Id*. at 32. When SBT moved to dismiss the state-court action, the municipality withheld occupancy permits to prevent sale of the units. *Id*. The state trial court dismissed the municipality's complaint, finding it to be frivolous, which the state's appeals court affirmed. *Id*.

SBT then filed suit in federal court alleging violations of SBT's right to equal protection. *Id*. at 32-33. SBT's federal court complaint alleged that the municipality did not undertake similar enforcement actions against similarly situated developers and others who had purchased duplexes on the same property. The district court dismissed SBT's complaint, but this Court reversed. This Court found the allegations of selective enforcement to be sufficient to withstand dismissal. *Id*. at 35. This Court credited SBT's allegation that the selective enforcement led to the inescapable conclusion that the municipality's primary goal was to render SBT financially insolvent. *Id*.

SBT alleged that the municipality's positions in the state-court litigation were "utterly unjustified" and "contrary to law," which more than sufficed to describe the type of "malice and bad intent" necessary for the case to proceed. *Id*.[1]

Similar allegations to those found in *SBT* pervade Appellant's Complaint. For example, Appellant alleges that Appellees made up a new standard when considering the application for a special exception for the Airport Project, by ignoring the plain text of the Zoning Ordinance to draw comparisons between Appellant's Project and others the zoning board of adjustment had previously approved. App. 19-21 at ¶¶ 37-40, 42-44. Appellees from the zoning board also found Appellant's Airport Project to be "offensive" on grounds that were explicitly covered by objective standards in the Zoning Ordinance (such as height and density) that the project unquestionably satisfied. App. 21-23 at ¶¶ 47-51, 54-55 (also consistent with the Town's master plan). These actions by Appellees are akin to the selective enforcement that was sufficient in *SBT*.

The Complaint also chronicles the journey through the state-court system Appellant endured, including the Superior Court's taking the ZBA to task for

---

[1] SBT benefitted from discovery it obtained in the state-court litigation to support its complaint. Appellant was not allowed to take any discovery in the case below before the District Court dismissed the complaint. Appellant's efforts to pursue discovery were rejected by the Magistrate Judge. *See* January 6, 2025 Order (staying discovery pending a ruling on the motion to dismiss), App. 9.

making decisions based on perceived unpopularity, in contravention of the legal advice provided by town counsel during the zoning board proceedings. App. 19 at ¶ 34 (Town counsel advised the zoning board); App. 24 ¶¶ 62-65 (the Superior Court agreed with Town counsel's advice that "zoning proceedings are not popularity contests."). The Superior Court, like its counterpart in the *SBT* state-court proceedings, found that Appellees lacked any reasonable basis to deny Appellant's application for a special exception. *Id*. at ¶ 65.

Appellant's Complaint provides exhaustive detail demonstrating that market-rate projects sailed through the ZBA, which evidences an unlawful animus against Appellant's affordable housing project and those who would occupy it. App. 27 at ¶ 77 (Appellees discriminated against the affordable housing project); App. 37 at ¶ 123 (Appellees stated their distain for the affordable housing project); App. 55 at ¶ 212 (Individual Defendants were motivated by a policy, practice or custom to discourage age-restricted, affordable housing and workforce housing projects); App. 56 at ¶ 222 (Appellees consciously and intentionally discriminated against Appellant's projects because they are an age-restricted, affordable housing project and a workforce housing project); *id*. at ¶ 224 (Appellees discriminated by contravening an explicit public policy to provide affordable housing). Particularly when compared against the other projects that obtained variances to

exceed Zoning Ordinance limitations and obtained special exceptions without any resistance at all, Appellees' conduct constitutes the very type of "impermissible considerations" at the heart of equal protection claims.[2]

The disparate treatment continued at the Planning Board, and again the animosity toward affordable housing drove the proceedings. The very first questions from the Appellees on the Planning Board did not address any of the applicable site plan regulations, but instead focused on whether the project constituted "subsidized housing." App. 27 at ¶ 77. Despite the allegations in the Complaint, the District Court somehow divined that the questioning about the finances of the prospective tenants was innocuous and could not possibly have reflected a bad faith intent, but such a speculative conclusion was unwarranted and inappropriate at the dismissal stage. Appellees from the Planning Board pressured Appellant to reduce the project's size, even though it met all objective criteria such as height and density, because they understood that eliminating units and adding a pitched roof made the project financially unviable. *Id*. at ¶ 78; App. 30 at ¶ 90 (the pitched roof was a "poisoned pill"

---

[2] Despite failing to justify their denial of Appellant's application in the Superior Court and the New Hampshire Supreme Court, Appellees on the ZBA found another way to thwart Appellant's project, by mandating that tenants at the facility have "stable incomes," a condition Appellees have never imposed on any other developer. App. 25-26 at ¶ 70, 72. Appellants had to fight to remove that condition as well. App. 26 at ¶ 73.

that could either kill the project or require it to be shrunk in size, which would cripple its economic viability). The insistence on a pitched roof was vexing because it contradicted the pressure to reduce the size of the structure. A pitched roof would have made the structure taller and would have placed it above the boundary permitted by the Federal Aviation Administration due to its proximity to an airport. App. 27 at ¶¶ 78-79. Like the plaintiff in *SBT*, Appellants found themselves receiving instructions from the Planning Board that were impossible to reconcile and follow. A direct parallel exists between Appellant's allegations and the municipality in *SBT* that intended to cause financial ruin.

Evidence of improper animus abounds in the Complaint. Appellees on the Planning Board insisted on an appraisal, even though the financial impact of the project on surrounding properties is not within the Planning Board's purview and the ZBA had already concluded the Airport Project would not cause any negative impact on surrounding values. App. 28, 32 at ¶¶ 81, 98-100. After obtaining the opinion of town counsel that the Planning Board could not insist on another appraisal, Appellees continued to press Appellant regarding the financial impact on nearby properties. App. 33 at ¶ 103. One Appellee went so far as to secure an *ex parte* opinion from an unnamed real estate professional to inject into the record, after the public portion of the proceedings

was closed, the view that the project would negatively impact property values in the area. App. 33-34 at ¶¶ 105-07. As with the other developers and purchasers in *SBT*, no other developer in Swanzey was forced to endure the same scrutiny as Appellant.

The Complaint also details that the Planning Board made up an entirely new method for calculating the amount of green space required in a parking lot, in an effort to drive up costs for Appellant in the hopes of rendering the project financially unviable. App. 29, 31 at ¶¶ 86, 88, 96-97. Appellees on the Planning Board then admitted on the record their reliance on the perceived unpopularity of the project as a basis to deny it site plan approval, even though the Superior Court had already ruled that doing so was unlawful. App. 34-35 at ¶¶ 109-12. These actions are similar to the municipality in *SBT* knowingly violating state law empowering the state department of environmental services authority over the subject site. After repeated protests from Appellant of disparate treatment, one Appellee openly admitted that the planning board intentionally treated the Airport Project differently than other similar projects. App. 35 at ¶ 113 (Appellee Johnson stated openly, "I think that you have been treated differently."). Despite these allegations, the District Court determined this could not possibly evidence unlawful intent and dismissed Appellant's Complaint.

The Complaint painstakingly compares how Appellees voted on the Airport Project with how they voted on other similar projects, in some instances in the meetings just before or just after consideration of Appellant's projects. Even though Appellant's project was nearly identical in size, Appellant's project was deemed to be "too big" while the others of the same size were satisfactory. App. 38-39, 42, 45-46 at ¶¶ 130-33, 147-49, 162-63, 166-67. The Planning Board fixated on whether Appellant's Airport Project was "harmonious with the neighborhood," even though the Planning Board never conducted such an examination on the other developers' projects, many of which were in the same neighborhood. App. 30 at ¶ 91.

If the allegations in *SBT* sufficiently alleged that the municipality's positions and actions were "utterly unjustified" and "contrary to law," to lead to the "inescapable conclusion" of impermissible considerations, this Court should reverse the lower court's decision and allow Appellant to proceed with its case because the same themes are present here.

### B. The District Court Did Not Properly Apply the Standard Applicable to a Motion to Dismiss.

The District Court's impermissibly stringent review of Appellant's Complaint not only contradicts the standard that should have applied to the Appellees' motion to dismiss, where the well-pleaded facts as taken as true, but the District Court also lost sight of the essence of an equal protection claim as

laid down by the Supreme Court. The fundamental center of an equal protection claim is whether the defendants intentionally treated the plaintiff differently from others similarly situated where there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 145 L. Ed. 2d 1060, 120 S. Ct. 1073 (2000).[3] Appellant's Complaint adequately alleges facts, supported by documentary evidence, that the Appellees treated Appellant differently without a rational basis to do so.

The District Court did not evaluate Appellant's comparison to the other projects that were treated favorably by Appellees;[4] the trial court's dismissal focused exclusively on the allegations regarding the Appellees' intent. Other courts have recognized that motions to dismiss are improper vehicles to

---

[3] It is noteworthy that the plaintiff in *Willowbrook* sued for violations of her rights even though she obtained relief from the municipality prior to commencing litigation. In that case, the municipality insisted on a 33-foot easement as a condition to connecting to municipal water. The landowner objected that only a 15-foot easement was required. The municipality ultimately relented and agreed to the 15-foot easement. Olech filed suit in federal court nevertheless, alleging that the municipality's initial insistence on the additional 18 feet violated her right to equal protection. The District Court dismissed, but the Seventh Circuit reversed, holding that a state action based on spite without any reasons related to a legitimate state objective was sufficient. The Supreme Court affirmed, focusing on the "class of one" concept. 528 U.S. 562.

[4] In the First Circuit, two entities "are similarly situated if a prudent person, looking objectively at the incidents [complained of], would think them roughly equivalent and the protagonists similarly situated . . . in all relevant respects." *Clark v. Boscher,* 514 F.3d 107, 114 (1st Cir. 2008).

evaluate defendants' intent, which is exactly what this trial court did below. *See*, *e.g.*, *A.B.C. Home Furnishings v. Town of E. Hampton*, 964 F. Supp. 697, 703 (E.D.N.Y. 1997) ("the issue of intent underlying an equal protection claim generally belongs to the trier of fact," so the court denied a motion to dismiss) (citing *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216-17 (2d Cir. 1987), *cert. denied*, 486 U.S. 1055, 100 L. Ed. 2d 922, 108 S. Ct. 2821 (1988)); *see also Hous. Works v. Turner*, 179 F. Supp. 2d 177, 200 (S.D.N.Y. 2001) (denying motion to dismiss).

The District Court's misapplication of the standard is particularly evident in its interpretation of statements made by Appellee Johnson, to which the trial court applied its own gloss. Appellee Johnson admitted that Appellant's Airport Project was being treated differently than other developers' projects. App. 35 at ¶ 113 (Appellee Johnson stated on the record, "A couple of times you have said 'we are being treated differently.' I think you have been treated differently."). Despite that admission, the District Court somehow determined that Appellee Johnson was not operating on an improper animus, contrary to Appellant's allegations, but that Appellee Johnson was instead concerned about the size of Appellant's Airport Project. Divining that intention, particularly in a way that was adverse to the non-moving party, was reversible error.

Even so, Appellant's Complaint makes clear that Appellee Johnson could

not have opposed the Airport Project based on its size, because the Zoning Ordinance set the height and density limitations, the Airport Project satisfied both, and she voted in favor of other projects of the same size. App. 34 at ¶ 108 (Appellee Johnson opined that the project was "too big" even though it met the objective criteria and she had voted in favor of other projects of the same size). Nor could Appellee Johnson have determined that other developers' use of their land was "appropriate" while Appellant's use for the Airport Project was "inappropriate" because the other developers' projects were in the same neighborhood and the only difference between the others' use and Appellant's is the age and income restrictions applicable to Appellant's project. App. 43 at ¶ 151 (Appellee Johnson voted in favor of increasing the footprint of the Asher/SMC project); App. 47 at ¶ 172 (Appellee Johnson did not request Flatley provide any landscaping calculations). It was irrational to reject Appellant's Airport Project on objective characteristics stated in the Town's Zoning Ordinance that it clearly met, particularly when she previously and subsequently approved other projects with the same essential characteristics.

Even when focusing just on Appellee Johnson, and disregarding the allegations against the other Appellees, the District Court ignored that Appellee Johnson openly stated her intention to vote based on perceived unpopularity, even though the Superior Court had already instructed Appellees that popularity

was not a lawful consideration.  App. 34-35 at ¶¶ 110-11.

Despite these allegations and without consideration of all of her statements, the District Court somehow resolved that Appellee Johnson held no animus against Appellant's projects.  The District Court somehow read Appellee Johnson's mind and ruled out any possibility that a finder of fact could determine Appellee Johnson to have denied Appellant's project based on impermissible considerations, a leap that should be reversed.  Appellee Johnson merely said out loud in two short sentences how the planning board viewed its task, which was to intentionally treat Appellant differently from other similarly situated developers without a rational basis for the difference in treatment. *Willowbrook*, 528 U.S. at 564.  The District Court's treatment of Appellee Johnson is emblematic of why the dismissal should be reversed.  The Complaint chronicles how other Appellees also treated Appellant differently.  Appellant addresses Appellee Johnson in some detail because the District Court did so, but the error in drawing conclusions about Appellees' intent extends throughout the District Court's analysis.

The Complaint alleges the type of campaign to cause substantial harm that was sufficient in *Rubinovitz v. Rogato*, 60 F.3d 906 (1st Cir. 1995) to survive a motion for summary judgment (as opposed to a motion to dismiss).  In *Rubinovitz,* this Court found evidence of personal hostility from a person who

did not even have official authority in the matter but who wielded power within a relatively small unit of municipal government to influence decisions that caused substantial harm. *Id*. at 912.

Appellant's Complaint compares favorably to other cases in which dispositive motions were denied. In *Brockton Power, LLC v. City of Brockton,* 948 F. Supp. 2d 48 (D.Mass. 2013), for example, the court found the following to be sufficient: the individual defendants were motivated by concerns such as preserving their own property values, protecting "their political and financial investment in opposition to the Project," promoting their careers, keeping a developer viewed as a foreign energy "powerhouse" out of Brockton, and exhausting the plaintiffs' resources and impairing their ability to secure financing. *Id*. at 52-53. Because the court concluded that the plaintiffs alleged that there was no rational basis for the difference in treatment, and did so with more than mere conclusory allegations, the court denied the Defendants' 12(b)(6) motion to dismiss the plaintiffs' equal protection claims. The same result is warranted here.

## C. *There Are Many Ways to Prove an Equal Protection Claim.*

The District Court's intense focus on a "bad faith intent to injure" as the only basis for Appellant's claim also was incorrect. Looking at this Circuit's precedent more closely, it is clear that a "bad faith intent to injure"

is one method, among a non-exhaustive list of potential options, to proving a violation of a plaintiff's right to equal protection. In *SBT Holdings*, this Court cited to *Barrington Cove, Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1 (1st Cir. 2001) and ultimately *Rubinovitz v. Rogato*, 60 F.3d 906, for a description of the elements of elements of the claim:

> In order to establish its claim, however, Barrington needed to allege facts indicating that, "compared with others similarly situated, [it] was selectively treated . . . based on impermissible considerations ***such as*** race, religion, intent to inhibit or punish the exercise of constitutional rights, ***or*** malicious or bad faith intent to injure a person."

*Barrington Cove,* 246 F.3d at 7 *(*quoting *Rubinovitz*, 60 F.3d at 909-10) (emphasis added; citations omitted). Note that this Court used the conjunction "or" before "malicious or bad faith intent to injure a person." Giving meaning to the "or," a plaintiff can prove a violation through various forms of impermissible considerations, one of which is a malicious or bad faith intent to injure.

This Court provided examples of impermissible considerations – race, religion, intent to inhibit or punish the exercise of constitutional rights – but this Court did not signal that list was the definitive, exhaustive list of impermissible considerations. The phrase "such as" clearly connotes that other impermissible considerations could satisfy the test. The District Court closed its analysis of Appellant's allegations without due consideration for the potential breadth

inherent in this Court's articulation of the test.

Appellant's Complaint alleges, with citations to evidence in the record, that Appellees denied approvals and imposed uniquely crafted conditions based on impermissible considerations such as a bias against age-restricted and/or affordable housing projects (and those who would live there), a desire to render the projects economically unviable and therefore cause financial peril to Appellant, and to ignore the advice of counsel and an order of the Superior Court that a project's perceived unpopularity cannot be the basis for depriving a landowner of its right to develop its parcel. Appellant should be allowed to pursue these impermissible considerations.

Appellant plausibly alleges that developers of market-rate projects were free to exceed zoning restrictions (with variances), construct with less expensive flat roofs, avoid cumbersome and costly landscaping requirements, and not have to endure years of litigation to correct unlawful conduct, while Appellant's age and income restricted projects were rejected due to their size, redesigned to implement costly pitched roofs and landscaping compelled by Appellees, and delayed by years of disparate treatment. App. 48-49 at ¶ 175 (including a chart comparing key elements of four projects). These are the types of impermissible considerations that the equal protection clause was intended to prevent, as developers should not receive different results through

the zoning process based on whether the project is market rate or not.

## II. The District Court Improperly Dismissed Appellant's Substantive Due Process Claim.

### A. *Fundamental Procedural Irregularities Pervade Appellant's Complaint.*

The District Court principally relied upon *Creative Env'ts, Inc. v. Estabrook*, 680 F.2d 822 (1st Cir. 1982) to dismiss Appellant's substantive due process claim. Importantly, *Creative Env'ts* is a decision rendered in the context of summary judgment, after the plaintiff undertook four years of discovery; it is not a decision in which the motion to dismiss standard was applied. *See id*. at fn. 10 (contrasting the posture of *Creative Env'ts* with that of *Kadar Corp. v. Milbury*, 549 F.2d 230 (1st Cir. 1977), which involved a motion to dismiss "where courts are traditionally very liberal in allowing plaintiffs to at least make a showing of their evidence.") (citation omitted). Two other cases important to the District Court's Order, *Crocker v. Hakes*, 616 F.2d 237 (5th Cir. 1980) and *Cloutier v. Epping*, 714 F.2d 1184 (1st Cir. 1983), are also summary judgment cases. This distinction is important, because construing the facts of the Complaint in Appellant's favor should lead to reversal.

To survive a motion to dismiss, a plaintiff must plead facts demonstrating "fundamental procedural irregularities," something more than

merely adversarial or arbitrary tactics employed by state actors. Appellant's Complaint satisfies that standard. In this case, the ZBA ignored the plainly worded text of the Zoning Ordinance to create a new test when considering Appellant's application for a special exception. App. 19-21, at ¶¶ 37-40, 42-44. The ZBA also found the Airport Project to be "offensive" because it was too large and used up too much of the lot, even though the Airport Project met the height and density requirements stated in the Zoning Ordinance. App. 22 at ¶ 51. A New Hampshire Superior Court found the ZBA's approach on both points to be unlawful. App. 24 at ¶¶ 62-64.

After Appellants secured affirmance of the Superior Court's decision from the New Hampshire Supreme Court, the fundamental procedural irregularities persisted. Although the ZBA approved the special exception, they imposed a condition that the tenants in the Airport Project have "stable incomes," a standard that was so vague it was sure to lead to further obstacles for the development. App. 25-26 at ¶ 70.

The subsequent planning board process also was plagued with fundamental procedural irregularities. Even though the topic has no connection at all to the site plan approval process, the planning board focused initially on whether the project would house tenants in "subsidized housing." App. 27 at ¶ 77. Appellees from the Planning Board cajoled

Appellant to reduce the size of its Airport Project, even though it was below the height limitation stated in the Zoning Ordinance. App. 27 at ¶ 78 (insisting that Appellant "take off" the top floor and add a pitched roof, which would rendered the project economically infeasible); *see also* App. 28, 30, 34 at ¶¶ 83, 90, 108. Appellees on the Planning Board attempted to force another appraisal of the Airport Project, even though the economic impact is not part of the site plan review. App. 28, 32-33 at ¶¶ 81, 98, 103.

One Appellee went so far as to engage a real estate professional on an *ex parte* basis, after the public comment period of the hearings concluded, to obtain an "opinion" that Appellant's project would negatively impact surrounding property values. App. 33-34 at ¶¶ 105-07. The Planning Board also created an entirely new standard for the amount of "green space" Appellant was required to include in the parking areas by forcing a mathematical analysis not supported by the text of the Zoning Ordinance. App. 29, 31 at ¶¶ 86, 95. The Planning Board retaliated against Appellant because Appellant would not agree to waive the statutory requiring that the planning board act on the application within 65 days. App. 33, 35 at ¶¶ 104, 115. Despite a prior ruling from the Superior Court that zoning decisions cannot be made based on the perceived unpopularity of a project, the Planning Board explicitly stated their intention to vote based on the public's

feedback and not on the standards set in the site plan regulations. App. 33 at ¶ 104. If these are not fundamental procedural irregularities, it is hard to imagine any way a developer could obtain the substantive due process required by the constitution.

Like the Airport Project, the West Swanzey project faced similar irregularities throughout the approval process. The Planning Board again insisted that the Appellant modify its design to include a pitch roof instead of a flat roof. App. 33 at ¶ 183. Appellant noted that neighboring buildings had flat roofs, that the flat roof design complied with the zoning dimensions, and a peaked roof would add significant cost to a rent-restrict project. App. 50-51 at ¶ 184. Yet Appellee Bachler continued to advocate for a pitched roof only for Appellant's project, going so far as to act *ultra vires* to obtain and present photographs to the Planning Board in support of his position. App. 51 at ¶ 185. Appellant received planning board approval for the West Swanzey Project that required a peaked roof design, at an additional construction cost of $500,000. *Id*. at ¶ 186. At the same time, two similarly sized market-rate projects were quickly approved by the Planning Board with flat-roof designs. *Id*. at ¶¶ 185-187.

The facts of this case are more egregious than those of *Kadar*, where the plaintiff alleged that one of the sixteen defendants "aided and abetted"

the Water Commission in adopting discriminatory rules and regulations, which was sufficient to survive a motion to dismiss. 549 F.2d 230. Had the District Court applied the proper standard to Appellant's Complaint, it would not have granted the motion to dismiss.

### B. The Standard in this Circuit Is Markedly Higher than in Other Circuits.

This Court is likely aware of the disharmony among the Circuits regarding the standard a plaintiff must satisfy to prove a violation of one's right to substantive due process. This Circuit sets the more stringent end of the spectrum, making it significantly harder for plaintiffs in this Circuit to pursue claims under the same set of facts than if they happened to reside elsewhere. Indeed, in this Circuit, a state actor can knowingly violate a law and find safety in cases like *Creative Env'ts*, 680 F.2d at 833 ("This would be true even were planning officials to clearly violate, much less "distort" the state scheme under which they operate."); *see also Chiplin Enters. v. City of Lebanon*, 712 F.2d 1524 (1st Cir. 1983).[5]

---

[5] The Third Circuit utilizes a similar "shocks the conscience" test to protect against egregious official conduct constitutes an abuse of that is "arbitrary in the constitutional sense," a standard acknowledged as "varying depending on the factual context." *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003).

In contrast, other Circuits examine substantive due process claims, including those for denial of permits to develop land, under less stringent standards. For example, in the Fifth Circuit zoning decisions that lack a rational basis are unconstitutional. *Shelton v. Coll. Station*, 780 F.2d 475, 482 (5th Cir. 1986) ("We hold that the outside limit upon a state's exercise of its police power in zoning decisions is that they must have a rational basis.…").

The Fourth Circuit utilizes a different standard, one that is still less onerous than this Circuit's. In *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983), the court surveyed the Circuits, including this one, and determined that even in the absence of racial discrimination, due process is deprived through acts of "manifest arbitrariness and unfairness." *Id*. at 1420-21 (finding the denial of the building permit to be extraordinary, extralegal, and in derogation of the zoning administrator's regular practice). In *Scott*, the court was also persuaded because the defendant contravened an express section of its own zoning ordinance. *Id*. at 1419. In this Circuit, in contrast, a willful violation of the law is insufficient. *Contrast with Creative Env'ts*, 680 F.2d at 833.

The Seventh Circuit examines whether the action was arbitrary or capricious. *See Scudder v. Town of Greendale*, 704 F.2d 999, 1002 (7th Cir.

1983) (denial of building permit was not arbitrary or capricious); *Albery v. Redding*, 718 F.2d 245, 251 (7th Cir. 1983) (examining whether the zoning action was arbitrary and unreasonable or whether it bore no substantial relation to the public health, safety, or morals.). More recently, the Seventh Circuit has acknowledged that it has applied a range of standards including whether the action was arbitrary or capricious, random and irrational, or sufficiently egregious to be "arbitrary in the constitutional sense." *CEnergy-Glenmore Wind Farm #1, LLC v. Town of Glenmore*, 769 F.3d 485, 488 (7th Cir. 2014). Appellant's Complaint would survive under that standard.

The Eleventh Circuit blends together several of the other Circuits' tests, such that substantive due process protects against "deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and . . . without any rational basis." *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (quoting *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir. 1982), *accord Anthony v. Franklin,* 799 F.2d 681, 684 (11th Cir.1986)). In another case, the Eleventh Circuit court found an administrative ***duty*** to approve a project that complied with applicable regulations. *Southern Cooperative Development Fund v. Driggers*, 696 F.2d 1347, 1356 (11th Cir.), *cert. denied*, 463 U.S. 1208, 77 L. Ed. 2d 1389, 103 S. Ct. 3539 (1983). In this case, Appellant's Complaint

demonstrates clearly that its projects met all of the criteria in the zoning ordinance (such as size, height, setback), and yet Appellees used those same characteristics to deny Appellant's project. App. 22, 27 at ¶¶ 51, 78-79.

Similarly, in the Sixth Circuit, a substantive due process violation occurs when zoning decisions are "arbitrary or irrational," where the "locality's action has no foundation in reason and is a mere arbitrary or irrational exercise of power." *Paterek v. Vill. of Armada*, 801 F.3d 630, 648 (6th Cir. 2015). In that Circuit, imposing conditions not required by statute in order to thwart the plaintiff and advance the defendant's own personal interest constitutes a violation of due process. *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983) ("The regular and impartial administration of public rules governing [liberty and property] interests, as required by due process, prohibits the subtle distortions or prejudice and bias" even where no class-based or other generalized invidious discrimination motivates the adverse treatment of a particular applicant.); *see also Paterek*, 801 F.3d 630 (Finder of fact could conclude that disparate treatment of business owner applicant in administration of land use ordinances motivated by "personality conflict" constituted arbitrary and capricious conduct.).[6] Appellant's Complaint alleges arbitrary and irrational conduct throughout.

---

[6] *See Pearson v. Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992) (summarizing the

In the Ninth Circuit, a substantive due process claim arises when "the interference with property rights was irrational or arbitrary." *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988) (denial of building permit violated the plaintiff's substantive due process rights where the regulations did not allow for the review that was used to justify the denial). Notably, the Ninth Circuit has held that land use decisions motivated by political pressure from neighbors rather than legitimate regulatory concerns may be arbitrary and irrational, and therefore violations of the application of substantive due process. *Del Monte Dunes v. Monterey*, 920 F.2d 1496 (9th Cir. 1990).[7] This standard is much more like that of the other Circuits and departs significantly from the more onerous standard applied in this one.

In the Second Circuit also, substantive due process "assures property owners of the right to be free from arbitrary or irrational zoning actions.…" *Brady v. Colchester*, 863 F.2d 205, 215 (2d Cir. 1988). In *Brady*, the

---

disparate tests utilized by the Circuits).

[7] The *Del Monte Dunes* court also highlighted that courts should only reluctantly dispose of plaintiffs' equal protection and substantive due process claims. 920 F.2d at 1508 ("In this type of action, where the property owner contends that it has been unconstitutionally deprived of property through governmental regulation, motions to dismiss and motions for summary judgment must be viewed with particular skepticism. The importance of the specific facts and circumstances relating to the property and the facts and circumstances relating to the governmental action militate against summary resolution in most cases.") (internal citation omitted) (reversing the trial court's granting summary judgment).

appeals court reversed the dismissal of a complaint where the defendants lacked any authority to revoke the issued building permit, to demand that the plaintiff apply for additional permits and certificates, and to subject the plaintiff "to the overall approval process," so a trier of fact could conclude there was no rational basis for the defendants' actions. *Id*. at 216. The facts of *Brady* echo those alleged in Appellant's Complaint and yet the result is very different in this Circuit.

It is fundamentally unfair to Appellant for a right secured by the United States Constitution to be applied so unevenly that Appellant cannot pursue its claim, even past a motion to dismiss, while developers and landowners in most other parts of the country are protected by the constitution.

### C. The Justification for This Circuit's Higher Standard is Absent on these Facts.

Part of this Court's justification for adopting a more stringent standard is the assumption that adequate state law remedies exist to vindicate claims surrounding zoning decisions. *Creative Env'ts*, 680 F.2d at 833 ("CEI may quite possibly have state law claims on the facts alleged. If so, there appear to be adequate state law remedies to vindicate these claims without resort to a federal court."). At least with respect to Appellant's case, there are no adequate state law remedies available. Appellant preserved through years of

unlawful violations of its rights, but it eventually obtained approvals. It is impractical and imprudent to deprive a plaintiff of its constitutionally-protected rights unless it undertakes the step of appealing a planning board's approval of the project to attempt to strip away the improper conditions imposed in the process.

More importantly, such an offensive appeal could not address the financial consequences suffered by a developer as time ticks away and costs increase to the point that a project is no longer economically viable, which is exactly what happened to Appellant in this case. App. 49-50 at ¶ 178 ("The unnecessary delays and forced design changes dramatically increased the cost of construction, lending charges, and carrying costs, which increased the debt and materially changed the financial modeling for the project. The Town of Swanzey's and the Individual Defendants' misconduct will cost Avanru millions of dollars in excess development costs and other damages."); App. 51 at ¶187 (Appellant incurred the additional $550,000 to construct a pitched roof at the West Swanzey Project).

Contrary to the assumption underpinning *Creative Env'ts*, New Hampshire has not adopted the equivalent of 42 U.S.C. § 1983 to create a mechanism to obtain monetary redress for violations of State constitutional provisions. *See Khater v. Sullivan*, 160 N.H. 372 (2010); *Bourne v. Town of*

*Madison*, 494 F. Supp. 2d 80 (D.N.H. 2007).  Without a path similar to

§1983, a plaintiff in New Hampshire does not have an adequate remedy to

protect itself against violations of the right to due process, particularly in

cases where perseverance results in obtaining the municipal approvals for

the project.  Yes, a developer can appeal the denial of approvals to a

Superior Court and, if necessary, the New Hampshire Supreme Court, to

ultimately obtain the right to build a project.  But, a developer that endures

fundamental procedural irregularities and obtains the required approvals has

no path under New Hampshire state law to seek redress for the harms

suffered as a result of actions that violate the developer's right to substantive

due process.  Even though the constitution guarantees certain rights, the state

actors (at least in New Hampshire) can operate with impunity.  At least on

the facts presented in this case, the logic underpinning *Creative Env'ts,*

which places a very high burden on a plaintiff and limits the reach of the

Constitution, leaves this plaintiff without any meaningful protection against

the worst possible conduct by state actors.[8]  The assumption underpinning

---

[8] Other courts do not see as this Court does the interplay between state court remedies and the protections of the Constitution. *See Rutherford v. City of Berkeley*, 780 F.2d 1444, 1447 (9th Cir. 1986) (because substantive due process is violated at the moment the harm occurs, the existence of post deprivation state remedies does not bar a § 1983 action) (citing *Gilmere v. City of Atlanta, Ga.*, 774 F.2d 1495, 1498 (11th Cir. 1985)).

*Creative Env'ts* is not applicable to Appellant (and likely other plaintiffs as well), so a re-examination of the doctrine is warranted.

## III.    Standard of Review

This Court reviews a dismissal of an order under Fed. R. Civ. P. 12(b)(6) de novo.  *SBT Holdings*, 547 F.3d at 33.

## Conclusion

For the reasons stated, this Court should reverse the District Court's dismissal of Appellant's Complaint.

Respectfully submitted,

Avanru Development Group, Ltd.

By its counsel,

August 27, 2025    /s/ James P. Harris
Robert H. Miller (Bar No. 6578)
James P. Harris (Bar No. 100058)
Sheehan Phinney Bass & Green, P.A.
1000 Elm Street, P.O. Box 3701
Manchester, NH 03105-3701
(603) 627-8145; (603) 627-8152
rmiller@sheehan.com; jharris@sheehan.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with Fed. R. App. P. 32(a)(7)(B)(1) because, excluding parts of the brief exempted by Fed. R. App. P. 32(f), it contains 8,198 words.  The brief complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in proportionally spaced 14-point Times New Roman font.


August 27, 2025                    /s/James P. Harris
                                   James P. Harris

## CERTIFICATE OF SERVICE

I certify that on August 27, 2025, I caused to be electronically filed the foregoing brief with the United States Circuit Court of Appeals for the First Circuit. I certify that the following parties or their counsel of record are registered as ECF filers and will be served via the CM/ECF System:

Town of Swanzey, NH Zoning Board, Town of Swanzey, NH Planning Board, Ann Karasinski, Adam Mulhearn, Bryan Rudgers, Robert Mitchell, Richard Lane, Jane Johnson, Steve Malone, Sylvester Karasinski, and Matthew Bachler.


August 27, 2025                    /s/James P. Harris
                                  James P. Harris

# **BRIEF ADDENDUM**

District Court Order denying Motion to Dismiss ......................................... 38

Judgment ....................................................................................... 70

Notice of Appeal ............................................................................. 71

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Avanru Development Group, Ltd.

     v.                                    Civil No. 24-cv-103-LM
                                             Opinion No. 2025 DNH 049 P

Town of Swanzey, NH Zoning Board, et al.

**O R D E R**

Plaintiff Avanru Development Group, Ltd. ("Avanru") brings suit against the Town of Swanzey, New Hampshire Zoning Board (the "Zoning Board"), the Town of Swanzey, New Hampshire Planning Board (the "Planning Board"), certain individual members of both the Zoning Board and the Planning Board, and a Town official.[1] Avanru alleges, generally, that defendants violated its constitutional rights to due process and equal protection by singling out two of its proposed housing developments for heightened scrutiny during the zoning and planning approval process. Before the court is defendants' motion to dismiss for failure to state a claim upon which relief can be granted. Doc. no. 24. Avanru objects to the motion. Doc. nos. 28, 31. For the following reasons, the court grants defendants' motion (doc. no. 24).

---

[1] The individual members of the Zoning Board named as defendants are: Ann Karasinski, Adam Mulhearn, Bryan Rudgers, and Robert Mitchell (the "Zoning Board Defendants"). The individual members of the Planning Board named as defendants are: Richard Lane, Jane Johnson, Steve Malone, and Sylvester Karasinski(the "Planning Board Defendants"). All of the foregoing individuals are named as defendants in both their individual and official capacities. Matthew Bachler (collectively with the Zoning Board Defendants and the Planning Board Defendants the "Individual Defendants") is sued in his former official capacity as the Town's Director of Planning & Economic Development.

**STANDARD OF REVIEW**

Under Rule 12(b)(6), the court must accept the well-pleaded factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 68, 71 (1st Cir. 2014) (quotation omitted). The court is not bound, however, to accept all factual allegations in the complaint as true—it may disregard facts which are "conclusively contradicted" by other sources of fact the court is entitled to consider on the motion. Lister v. Bank of Am., 790 F.3d 20, 23 (1st Cir. 2015) (quoting Soto-Negrón v. Taber Partners I, 339 F.3d 35, 38 (1st Cir. 2003)). In addition to facts alleged in the complaint, the court may also consider facts contained in exhibits to the complaint. See Freeman v. Town of Hudson, 714 F.3d 29, 35 (1st Cir. 2013).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Analyzing plausibility is "a context-specific task" in which the court relies on its "judicial experience and common sense." Id. at 679.

**BACKGROUND[2]**

Avanru is a for-profit corporation based in Walpole, New Hampshire that focuses on developing affordable housing in southwest New Hampshire and the

---

[2] The facts are drawn from the complaint and the exhibits attached thereto.

2

surrounding region. Starting in the winter of 2020, Avanru sought approval to build two separate affordable housing projects in Swanzey. The "Airport Project," as proposed, would be located on a parcel of land near the Keene Dillant-Hopkins Airport that Avanru had a contractual option to purchase, and would consist of 76 age- and income-restricted residential units. The "West Swanzey Project," which is now fully constructed and occupied, is located on a parcel of land in West Swanzey and consists of 84 income-restricted units. At the time Avanru initially sought approval for the West Swanzey Project, Avanru held a contractual option to purchase the parcel it was proposed to occupy. Avanru now owns that parcel. While the two projects shared similarities, namely the identity of their developer, and that they were both 'affordable housing' projects premised on income-restrictions for tenants, they were distinct projects to be located in different neighborhoods, and they required separate applications for approval by the Zoning and Planning Boards.

Both the Airport Project and the West Swanzey Project were to be located in Swanzey's Business District, which does not allow multi-family housing projects as an ordinary permitted use. The Swanzey Zoning Ordinance only allows for a multi-family dwelling to be constructed within the Business District pursuant to a special use exception issued by the Zoning Board. Both of Avanru's projects thus required special use exceptions from the Zoning Board.

I.    <u>Avanru's Initial Application for Zoning Approval of the Airport Project</u>[3]

Avanru filed an application for a special use exception for the Airport Project on February 28, 2020. The Zoning Board considered Avanru's application at a public meeting on April 20, 2020. Due to the global disruption caused by the COVID-19 pandemic in March and April of 2020, the April 20 meeting was the first public meeting the Zoning Board had held since Avanru had filed its application, and the first meeting the Zoning Board ever conducted via videoconference.

At the April 20 meeting, Avanru's representatives spoke in support of their application and responded to questions and comments posed by members of the community. Despite Avanru's presentation regarding the merits of the proposed project, the community members in attendance uniformly voiced concerns about the impact the project would have on the neighborhood and the community at large. Specifically, residents noted concerns stemming from the perception that the project would increase density in the neighborhood, including concerns regarding increases in both vehicular and pedestrian traffic, and increased use of local resources such as a nearby pond. Multiple residents also noted concerns regarding the potential for the project to interfere with the rural character of the neighborhood, to create an eyesore, and to negatively impact property values. Two residents specifically noted concerns that, were the project to accept Federal Section 8 housing vouchers, such properties have been shown to negatively impact property values in the

---

[3] The following account of the Zoning Board and Planning Board meetings regarding Avanru's applications for approval of the Airport Project is drawn directly from the transcripts and meeting minutes for those meetings, which Avanru attached as exhibits to its complaint.

surrounding area. Due to the large number of community members that wished to speak at the meeting, the Zoning Board was unable to accommodate everyone within the allotted time. At 10:35 PM, thirty-five minutes after the meeting was scheduled to conclude, the Zoning Board passed a motion to continue the hearing to a special meeting on May 4, 2020.

The May 4 meeting began by continuing the opportunity for members of the community to pose questions and comments. The tenor and substance of the public comments and questions at the May 4 meeting were substantially similar to those of the prior meeting. At this meeting Attorney Michael Courtney, acting as counsel for Swanzey, advised all present that the public popularity of the project, or lack thereof, was not an appropriate consideration for the Zoning Board in determining whether to grant the application. Once all community members that wished to speak had been afforded an opportunity to do so, members of the Zoning Board asked a few questions of their own to Avanru's representatives. Those questions were generally targeted at specific project details, including the color of the building and the size and location of the fire lanes. Following the questions from members of the Zoning Board, and a final opportunity for public comment, Avanru's representative was afforded an opportunity to speak, once again, on behalf of its application.

Following Avanru's concluding statement, the Zoning Board brought the public portion of the meeting to a close to consider and vote on the application. In the closed meeting, the Zoning Board collectively reviewed and considered whether the proposed project met the four conditions necessary for issuance of a special use

exemption, which are laid out in the Swanzey Zoning Ordinance. Those conditions are:

    (a) The proposed use is similar to one or more of the uses already authorized in that district and is in an appropriate location for such a use;

    (b) Such approval would not reduce the value of any property within the district, nor otherwise be injurious, obnoxious, or offensive to the neighborhood;

    (c) There will be no nuisance or serious hazard to vehicles or pedestrians;

    (d) Adequate and appropriate facilities will be provided for the proper operation of the proposed use.

Town of Swanzey Zoning Ordinance, Section XII Art. C.2. In considering whether Avanru's application met the first condition, Zoning Board Defendant Mitchell compared the proposed project to two existing projects in the area that Avanru's representatives had brought up in their presentations. Mitchell stated that, because he felt that the proposed Airport Project was dissimilar to those existing projects due to their density, setbacks, and use of the land, he would vote that the first condition is not met. Defendant Ann Karasinski expressed her agreement with Mitchell. She voted no on the first condition, stating that she found the proposed Airport Project dissimilar to the existing projects identified by Avanru because, unlike the other projects, it was not obscured from public view by trees. Defendant Rudgers stated that he believed the proposed use was similar to uses already authorized, but that he did not believe the proposed project was in an appropriate location for such a use, and he therefore voted no as to condition one. Defendant Mulhearn also voted no as to condition one, but the record of the meeting does not show that he gave a specific reason for his vote. Only one member of the Zoning

Board, who is not named as a defendant in this action, voted that Avanru's application met the first condition necessary for granting a special use exception. While two members, Mitchell and Ann Karasinski, voted that the proposed project would be offensive to the neighborhood under the second condition, a majority of the Zoning Board voted that Avanru's application did meet the other three criteria. However, following from their determinations that the proposed Airport Project was not similar to one or more of the uses already authorized in the district, or was not in an appropriate location for such a use, the Zoning Board voted 4-1 to deny Avanru's application.

II.     Avanru's Appeal of the Zoning Board Denial

Avanru filed a motion for reconsideration of the denial on May 14, 2020, which the Zoning Board denied at its next public meeting on May 18. Avanru then filed an appeal of the Zoning Board's denial of its application to the Cheshire County Superior Court.

On December 14, 2020, the Superior Court vacated the Zoning Board's decision, finding that Zoning Board erred in its analysis of the first condition required for a special use exception. Specifically, the Court found that the Board had erred by comparing the proposed project to other projects that had previously been constructed pursuant to special use exceptions, rather than comparing the proposed project to the other uses explicitly permitted in the Business District. The Board also erred, according to the court, by finding the proposed project to be offensive without a sufficient factual basis in the record to support that finding. The Court also noted that it was inappropriate for the Zoning Board to focus on the

7

aesthetics of the proposed project, and to rely on public comments to make its decision.

On January 8, 2021, Swanzey appealed the Superior Court's order vacating its denial of Avanru's application to the New Hampshire Supreme Court. The Supreme Court affirmed the Superior Court's order on August 16, 2022.

III.    The Zoning Board's Approval of the Special Exception

Following the Supreme Court's ruling, Avanru returned to the Zoning Board to once again seek the necessary special use exception to proceed with the Airport Project. On September 19, 2022, the Zoning Board voted to grant the special use exception in a closed hearing. At the closed meeting and prior to approving the special use exception in its final form, the Zoning Board considered adopting a version of the exception that contained the following restrictions: "[the] development is not Section 8 but is age-restricted senior housing for 62 years of age and over. The tenants must have stable incomes. Persons making between $25,000 to $45,000 per year will likely qualify for these units." Doc. no. 1-13. These restrictions were proposed by Mulhearn, who stated that he understood the restrictions he articulated to mirror the age and income restrictions that Avanru had outlined in its presentation of its application to the Board. Indeed, Mulhearn articulated the restrictions by quoting directly from a portion of the draft minutes for the April 20, 2020 meeting that covered Avanru's initial presentation in support of its application.

While the Zoning Board initially voted to grant the special use exception with Mulhearn's restriction language included, later in the meeting the Board amended

8

the terms of the exception to remove the language regarding Section 8, as well as the specific income range. Thus, the final language of the special use exception approved by the Zoning Board at the September 19 meeting contained the following conditions: "that the development be age-restricted senior housing for 62 years of [age] and over and with stable incomes, as defined by the applicant at the Zoning Board of Adjustment Public Hearing of April 20, 2020 and recorded in the draft minutes of the April 20, 2020 [meeting]." Id.

On September 23, 2022, Swanzey issued a written Notice of Zoning Board Decision granting Avanru's requested special use exception for the Airport Project. The written decision stated that Avanru had been granted a special use exception to construct "a 76-unit age-restricted (62 and over) multi-family development," but did not contain any reference to the requirement that tenants have stable incomes, or any other restrictions based on Avanru's presentation of the project before the Zoning Board. Doc. no. 1-14. Avanru subsequently filed a motion for rehearing to clarify that the additional restrictions discussed on the record at the September 19 meeting but not included in the language of the notice of decision were not operative. At its October 17, 2022 meeting, the Zoning Board considered Avanru's motion for rehearing and confirmed that the language of the September 23 notice of decision was controlling, and that the additional restrictions discussed on the record on at the September 19 meeting were not operative.

IV.    Avanru's Application for Planning Board Approval of the Airport Project

Having secured zoning approval, Avanru applied for Planning Board approval of the design and plans for the Airport Project. The Planning Board began

9

its consideration of Avanru's application at a public meeting on November 10, 2022. First, Avanru's representatives were given an opportunity to speak on behalf of their plans for the project. Following Avanru's presentation, members of the Planning Board posed questions to Avanru's representatives. Defendant Malone began the questioning by inquiring about the specifics of the income restrictions for tenants. Malone also asked about provisions for household refuse management, Americans with Disabilities Act compliance, and the number of one-bedroom and two-bedroom units in the design. Defendant Lane asked about plans for propane gas storage on the property, about parking accommodations for visitors, and about compliance with Federal Aviation Administration ("FAA") requirements due to the proximity to Keane Dillant-Hopkins Airport. Defendant Johnson asked for further explanation of the septic plan design.

After the Planning Board members concluded their questions, the Board opened the floor to members of the public that were in attendance. As had been the case at the Zoning Board meetings, a significant number of community members wished to ask questions and make comment on Avanru's plans for the Airport Project. Once again, the community members in attendance generally expressed concerns about the size of the project relative to the plot and the location, and the impact that project would have on the surrounding area, infrastructure, and residents. One resident expressed a specific concern about the appearance of the proposed design, stating that a square building would not fit in well with the surrounding neighborhood. Another resident opined about the advantages of a pitched-roof design relative to the proposed flat-roof design. Another resident stated

10

a concern that, due to the project's proposed height, it could block sunlight to nearby homes. Another community member raised a concern about the height of the structure, stating that the four-story project would stand out from the surrounding two-story structures. Residents also asked questions and made comments regarding the specifics of the age and income restrictions for tenants, and how the income restrictions would impact the project's tax obligations to the Town of Swanzey.

Following the conclusion of the public comment opportunity, members of the Planning Board made several requests for Avanru to consider modifying the project plans. Specifically, Planning Board member Michael York, (who is not named as individual defendant in this case), asked that Avanru consider making changes to the design to improve its aesthetic value, and assuage concerns about impact to property values in the area. Following up on that request, Malone asked Avanru to consider altering the project design to remove the top floor and to add a pitched roof. Following several additional questions regarding certain specifics of the design drawings, the Planning Board passed a motion to continue the public hearing on Avanru's application to its next meeting on December 8, 2022.

The December 8, 2022 meeting began with a presentation from Avanru's representatives noting changes Avanru had made to the project plans based on the community and Board feedback at the prior meeting. Specifically, the plan changes consisted of adding 44 additional windows to the design. The plan changes did not, however, include any modifications to the height of the structure, or the flat-roof design. Following Avanru's presentation, there was an opportunity for public questions and comments, during which members of the community expressed a

11

number of sentiments and concerns similar to the ones that had been expressed at the prior meeting. Multiple community members once again highlighted their displeasure with the flat-roof design, stating that it was not in aesthetic harmony with the other structures in the area. Following the public comment opportunity, the Chair of the Planning Board Scott Self (who is not named as an individual defendant) requested comments from the other Board members. The Chair noted that, while residents had continued to raise concerns regarding the building height and the roof design, the proposed building height was allowed under the applicable rules, and any requirement by the Board for a pitched roof would likely be challenged in court. Following further discussion, the Board passed a motion to continue the hearing to its following meeting so that Avanru could amend its plans to comply with a vegetation requirement imposed by ordinance. Prior to closing the hearing, the Board also voted to deny Avanru's request for an allowance to reduce the number of parking spaces otherwise required by ordinance by 20%, despite the fact that Avanru had presented a study in support of the request.

Following that vote, the Chair prompted a discussion about the roof design. Lane stated that he felt the roof design should be changed to make it more compatible with the neighborhood. Johnson agreed, noting that the building would sit directly across the street from houses with pitched roofs, and that while there were other buildings in the surrounding area with flat roofs, none of those buildings were as close to houses as Avanru's proposed project. Following an additional round of public comment, in which community members once again voiced a strong preference for a pitched-roof design, the Board voted to request Avanru to present

12

amended roof designs, such as pitched or gabled/mansard designs, at the following meeting.

The Planning Board reconvened on December 12, 2022 to continue its hearing on Avanru's application. At the outset, Avanru's representative presented changes to the project plans in response to the comments and requests from the Board and the community at the prior meeting. Those changes included: adding additional landscaping and trees; improving the travel layout around the building for emergency responders; adding an additional recreation area; and, most notably, amending the building design so that the front-facing façade would be three stories with a faux pitched roof, while the middle section of the building would remain four stories with a flat roof. This adjustment to the height and roof design resulted in a reduction of the total number of units from 76 to 74. The Chair responded to Avanru's presentation by noting that the applicant had made a number of material changes, and recognizing that a lot of work had been done to address the concerns raised at prior meetings regarding the project's appearance. Defendants Johnson and Malone expressed agreement that the new plan was more attractive and appreciation for Avanru's efforts in amending the design. Lane, however, expressed confusion as to why it had taken so long for Avanru to present a visually pleasing design, and stated that he was still not entirely satisfied. An opportunity was given for public comment, during which community members in attendance once again expressed concerns about the project, despite the updated design. In the context of an exchange regarding specific aspects of the updated architectural design, Johnson made the following statement:

13

> A couple of times you have said "we are being treated differently." I think you have been treated differently. It's taken a long time, but this is quite a different project. And the size of this project, on the size of the lot that it's situated on, and in the area that it is situated, it's so different from anything else around there, and I think that's why it seems that you've been treated differently.

Doc. no. 1-29 at 35.

The Chair then closed the public hearing and stated possible conditions for final approval of the application, which included certain updates to plans for compliance with requirements, including the landscaping, drainage, and utilities plans, as well as approval from the FAA, the New Hampshire Department of Environmental Services, and the New Hampshire Department of Transportation. Following this discussion, Lane stated that he would like an independent evaluation concerning the effect of the project on surrounding property values in the neighborhood. The Chair responded by stating that such a request was problematic because it was not appropriate for the Planning Board to set conditions for approval and then create additional conditions once the applicant had met the originally stated requirements. The Chair further noted that such an evaluation would necessitate an additional public comment opportunity, and that the request should have been raised earlier in the process. Lane and Johnson nevertheless stated that they did not feel it was too late to consider such an analysis. Before closing the meeting, the Board passed a motion to table the discussion regarding an independent analysis to its next meeting, and to seek advice from counsel regarding whether an independent analysis was permitted at this juncture.

14

The Planning Board reconvened on January 12, 2023. At the start of the January 12 meeting, the Board considered a letter from counsel for Swanzey advising that the Planning Board was not empowered to commission an independent analysis of the project's impact on surrounding home values at this juncture. Johnson and Lane, however, stated on the record that they disagreed with the opinion of Swanzey's counsel. Defendant Karasinski also voiced skepticism as to the merits of the study Avanru had previously submitted on the subject during the Zoning approval process. Lane further stated that he had consulted with unnamed contacts purported to have expertise in real estate matters, and that those contacts had opined that the Airport Project would harm surrounding property values. Johnson reiterated the now familiar concern that the project was still too large for the parcel given the existing character of the residential neighborhood. York then opined that, while he agreed with the concerns expressed, he believed that they were not proper bases on which to deny Avanru's application. The Chair expressed agreement with York's position. Following this discussion, a vote was held on a motion to approve Avanru's application. The motion failed by a vote of four to three, with the four Planning Board Defendants voting against.

Following the vote, the Chair instructed that the Board was required to state its grounds for denial and asked the Planning Board Defendants to articulate such grounds. Karasinski stated that he voted to deny because Avanru had not agreed to his request to extend the time limit to rule on the application by sixty-five days. Lane also referenced the refusal to extend the time limit, stating that he wanted to further explore the project's potential impact on property values, which would be

15

impossible without an extension. Malone stated that the project as proposed was not in harmony with the surrounding neighborhood and would ruin the character of the neighborhood and the town. The Chair responded to these reasons by stating that he did not believe they were sufficient to support the denial because they made no reference to the applicable ordinances. Johnson once again opined that the project was too large for the parcel given the character of the surrounding neighborhood, to which the Chair responded that the relevant consideration was not the local neighborhood, but the Business Zoning District at large. In response to this, Johnson made the following statement:

> The only thing I can say—and this is not my opinion—but this is why I don't think I can vote for this—because I am an elected member of the Planning Board. The people of Swanzey have elected me, and that's who I represent here. I don't represent me. I don't like the looks of the building, and I certainly wouldn't want it in my neighborhood, and I'd fight like hell to keep it out of my neighborhood. And it probably wouldn't make any difference, just like these people.
>
> But I am here to represent the Town of Swanzey that I care very much about. And I'd like to see things done in Swanzey that enhance its value, not something that is an enormous plot right in the middle of what we have. I don't know how to better say it. Maybe if I had time to think more about it, I would. But that's where I'm coming from. I can't vote for it.

Doc. no. 1-22 at 10.

The Chair responded, once again, by stating that he did not believe the reasons articulated by the Planning Board Defendants were valid reasons to deny the application. Despite this admonition, Malone made a motion to deny the

16

application. That motion passed by a vote of four to three, with the Planning Board defendants voting to the deny the application.

The Planning Board issued a written Notice of Decision denying Avanru's application on January 17, 2023. In the Notice of Decision, the Planning Board cited three reasons for the denial: (1) "the over intensification of land use"; (2) "the inappropriateness of the location considering a recent plane crash;" and (3) "the proposal did not fit the character of the neighborhood." Doc. no. 1-33. Immediately following issuance of the Notice of Decision, counsel for Avanru sent a letter to counsel for Swanzey instructing Swanzey to preserve all evidence relating to the Planning Board's consideration of Avanru's application, signaling Avanru's intent to commence litigation regarding the denial.

Following receipt of Avanru's preservation notice, the Planning Board reconvened on February 2, 2023 to reconsider its denial of Avanru's application. While each of the Planning Board Defendants again expressed their reservations about the project, the Board nevertheless passed a motion to approve Avanru's application by a vote of five to one. Only Malone voted against granting the application on reconsideration. The Planning Board subsequently issued a written notice of decision on February 6, 2023 granting Avanru's application subject to certain administrative conditions for approval, including the submission of required Federal and State permits, and detailed technical plans.

V.    Avanru's Applications for Approval of the West Swanzey Project

Avanru filed an application with the Zoning Board for a special use exception to construct the West Swanzey Project sometime prior to March 15, 2021. That

17

Add. 054

application was considered and approved by the Zoning Board at a March 15 public meeting. The Board issued a written Notice of Decision formalizing the approval on March 17, 2021.

Avanru subsequently filed an application with the Planning Board for site plan approval for the West Swanzey Project. The Planning Board took up consideration of that application at a public meeting on May 13, 2021. After reviewing that application, the Planning Board requested that Avanru submit proposals for additional roof designs beyond the flat-roof design of the initial proposal. The Board continued its consideration of the West Swanzey Project application at its next public meeting on May 27, 2021. At that meeting, Avanru presented proposals for both a low-pitch-roof design, and a gable-roof design. Members of the Planning Board expressed their preference for the gable design, to which Avanru's representatives responded that such a design would increase the cost of the project by $1,000,000. Ultimately the Planning Board voted unanimously in favor of a motion endorsing the gable-roof design, following statements from members of the Board and the public that the gable-roof design would greatly enhance the project's harmony and compatibility with the existing site and neighborhood. The Board also voted to approve a motion granting Avanru's request to reduce the number of parking spaces below the number presumptively required by ordinance. Following passage of those motions, the Planning Board entered a closed session. In the closed session the Board voted on a motion to approve Avanru's application for the West Swanzey Project. That motion was passed by a vote of six to one, with only Johnson voting against.

18

The Planning Board issued a written Notice of Decision on June 1, 2021 memorializing the site plan approval for the West Swanzey Project. The Notice of Decision articulated a number of conditions of approval, including the requirement that the West Swanzey Project be constructed with a gable-roof design, as proposed at the May 27 meeting. Avanru alleges that the change to the gable-roof design actually resulted in an increase of approximately $550,000 to the overall cost of the West Swanzey Project.

VI.     Avanru's Claims

In the instant lawsuit, Avanru brings seven claims for relief against all defendants:

- **Count I**: claims relief under 42 U.S.C. § 1983 alleging that defendants violated Avanru's right to equal protection under the law guaranteed by the Fourteenth Amendment to the United States Constitution. This Count is premised on a so-called "class-of-one" theory of discrimination.

- **Count II**: claims relief under 42 U.S.C. § 1983 alleging that defendants violated Avanru's right to substantive due process guaranteed by the Fourteenth Amendment to the United State Constitution.

- **Count III**: claims relief under the New Hampshire Constitution alleging that defendants violated Avanru's rights to equal protection under the law guaranteed by Part I Articles 2 & 12 of that document.

- **Count IV**: claims relief under the New Hampshire Constitution alleging that defendants violated Avanru's rights to substantive due process guaranteed by Part I Articles 2 & 12 of that document.

- **Count V**: claims relief under RSA 643:1 alleging that the Zoning Board and the Zoning Board Defendants committed official oppression against Avanru.

- **Count VI**: claims relief under RSA 643:1 alleging that the Planning Board and the Planning Board Defendants committed official oppression against Avanru.

- **Count VII**: seeks attorney fees and double taxation of costs under RSA 677:14 alleging that the Zoning Board abused its power and acted with malice, bad faith, or gross negligence in denying Avanru's initial application for a special use exception.

## DISCUSSION

Defendants move to dismiss Avarnu's complaint in its entirety. As the court's analysis turns on the sufficiency of Avanru's allegations to state plausible claims for relief under Counts I & II, the court begins with those counts.

First however, a note on the court's treatment of the complaint and the attached exhibits. On a motion to dismiss under Rule 12(b)(6), the court must treat all well-pleaded factual allegations in the complaint as true and make reasonable inferences in the plaintiff's favor, but the court is not required to accept conclusory allegations as true merely because they are stated in the complaint. See Cardigan Mountain Sch. v. New Hampshire Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015). In addition to facts alleged in the complaint, the court is also entitled to consider facts contained in exhibits to the complaint. Freeman, 714 F.3d at 35; see also Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) ("Exhibits attached to the complaint are properly considered part of the pleading 'for all purposes,' including Rule 12(b)(6)." quoting Fed. R. Civ. P. 10(c)). Separately, the court is also entitled to consider matters of public record, documents of undisputed authenticity, and documents sufficiently referred to in the complaint,

20

even where those documents are not attached as exhibits to the complaint. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Just as the court is not bound to credit conclusory allegations, it is also not required to credit factual allegations in the complaint that are "conclusively contradicted" by other sources the court may properly consider on the motion. See Lister, 790 F.3d at 23; Soto-Negrón, 339 F.3d at 38. In considering when factual conflicts should be resolved in favor of the exhibits, the Eleventh Circuit has stated that "[t]he rule is specific over speculative, concrete over conclusory." Gill v. Judd, 941 F.3d 504, 514 (11th Cir. 2019). "When exhibits attached to a complaint contradict the general and conclusory allegations of the pleading, the exhibits govern." Id.

Here, Avanru submitted 74 exhibits to its complaint consisting primarily of meeting minutes and full transcripts of all relevant hearings before both the Zoning Board and the Planning Board regarding both the Airport Project and the West Swanzey Project. Many of these exhibits contradict conclusory allegations in Avanru's complaint regarding what transpired at various public meetings, defendants' treatment of Avanru and its projects, and defendants' motivations for their actions. To the extent the complaint makes general and conclusory allegations that are contradicted by specific facts contained in the transcripts and meeting minutes, the court is entitled to credit the specific facts evidenced in the exhibits. See Lister, 790 F.3d at 23; Gill, 941 F.3d at 514.

The court also notes that, even if Avanru had not attached the meeting minutes and transcripts to the complaint, the court would still have been entitled to consider them on this motion because: (1) they are public records; (2) Avanru

21

referred to them extensively in its complaint; and (3) Avanru does not dispute that they accurately reflect the relevant proceedings, and cannot plausibly do so given its extensive reliance on them in framing its pleadings. See Watterson, 987 F.2d at 3.

I.      Avanru Fails to Allege Conduct by Defendants Sufficient to State a Claim Under § 1983 Regarding the Zoning Disputes at Issue

It is well settled in the First Circuit that ordinary "run of the mill disputes between a developer and a town planning agency" are not cognizable under 42 U.S.C. § 1983. Creative Env'ts, Inc. v. Estabrook, 680 F.2d 822, 833 (1st Cir. 1982). Otherwise, "[v]irtually every alleged legal or procedural error of a local planning authority or zoning board of appeal could be brought to federal court." Id. at 831. As Avanru acknowledges, the rule denying § 1983 liability for garden variety zoning disputes "is designed to avoid converting federal courts into super zoning tribunals." Eichenlaub v. Twp. of Indiana, 385 F.3d 274, 285 (3d Cir. 2004); see also Vill. of Belle Terre v. Boraas, 416 U.S. 1, 14 (1974) (Marshall, J. dissenting) ("[A Federal Court's] role is not and should not be to sit as a zoning board of appeals."). The rule recognizes that, in "the vast majority of instances, local and state agencies and courts are closer to the situation and better equipped to provide relief." Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992). It also accounts for the fact that, in ordinary cases, plaintiffs have "adequate state law remedies to vindicate these claims without resort to a federal court." Creative Env'ts, 680 F.2d at 833.

Thus, to state a claim under § 1983 in the context of a zoning dispute, a plaintiff must allege that the defendants' actions were "tainted with fundamental

procedural irregularity, racial animus, or the like." Id.; see also PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991), overruled on other grounds by San Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465 (1st Cir. 2012) (requiring well-pled allegations of "invidious discrimination" on the basis of a protected classification such as race or sex, or "egregious procedural irregularities or abuse of power" to state a claim under § 1983 in the context of a zoning dispute). Allegations that "planning officials . . . clearly violate[d]" governing law are not sufficient to meet this strict standard. Creative Env'ts, 680 F.2d at 833. Neither are allegations that such officials "engaged in adversarial and even arbitrary tactics" in opposition to a plaintiff's interests. Id. at 829.

The factors motivating Creative Environments are equally relevant to class-of-one style Equal Protection claims. Indeed, the First Circuit has explicitly warned of the "obvious danger to opening up local permitting decisions to detailed federal judicial scrutiny under [the] equal protection rubric." Nestor Colon Medina, 964 F.2d at 44. Because "[i]f disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differently from a similarly situated applicant, the correctness of virtually any state permit denial would become subject to litigation in federal court." Id. at 44-45. To address these concerns, the First Circuit imposed an additional requirement for class-of-one claims in the zoning context: the alleged disparate treatment must have been motivated by a "malicious or bad faith intent to injure." SBT Holdings, 547 F.3d at 35.

23

Even viewed in the most favorable light possible, the allegations in Avanru's complaint and its exhibits cannot clear these high hurdles. First, Avanru devotes significant space in both its complaint and its briefing to the allegation that the Zoning Board based its initial denial of Avanru's application for approval of the Airport Project on impermissible factors such as the perceived unpopularity of the project and comparison of the project to previously granted special use exceptions, rather than to generally permitted uses within the relevant zoning district. Similarly, Avanru also highlights its allegation that the Planning Board Defendants initially voted to deny approval of the Airport Project plans based on impermissible factors such as size and density, despite the fact that the plans complied with all objective criteria laid out by law. But these allegations, even taken as true, amount to nothing more than allegations that defendants "clearly violate[d]" the applicable local ordinance, and are insufficient to state a claim under Creative Environments. Id. at 833; see also Cloutier v. Town of Epping, 714 F.2d 1184, 1189 (1st Cir. 1983) (holding that even "blatant application of ordinances which [zoning officials] knew were totally void" was insufficient to establish § 1983 liability).

Second, Avanru points to allegations that defendants' wrongdoing required it to "endure years of delay" which caused "the cost to develop the project [to] skyrocket[.]" Doc. no. 1 at 2; doc. no. 31 at 2 n.2. The allegation that the defendants' wrongdoing caused "years of delay" is conclusory and is contradicted by the exhibits to the complaint. The meeting minutes show that, taking account for minimal disruptions in March of 2020 due to the global outbreak of COVID-19, defendants considered and resolved each of Avanru's applications within a reasonable

24

timeframe. Indeed, the delay in approval of the Airport Project was actually caused by the lengthy appeal process in state court.[4] But defendants did not engage in wrongdoing by exercising their right to appeal the state court judgment.

Third, Avanru offers allegations that defendants subjected it to arbitrary requirements regarding roof designs and a "made up . . . formula" regarding green space that were "poisoned pill[s]" intended to "cripple [the projects'] economic viability." Doc. no. 31 at 3; doc. no. 1 ¶ 90. But even drawing the inference in favor of Avanru that defendants intended these actions to delay or thwart approval of the projects, these allegations amount to nothing more than "adversarial" and "arbitrary" tactics, which do not give rise to § 1983 liability in these circumstances. Creative Env'ts, 680 F.2d at 829 (assuming that defendants invented new and onerous requirements for plaintiffs with the specific purpose of frustrating plaintiffs' development efforts, and finding that even if true, such facts would still not justify § 1983 liability in the zoning context). They cannot be considered more serious than the "malicious delaying tactics" that were insufficient to support liability in Cloutier. 714 F.2d at 1189 (finding allegations that zoning officials committed perjury and provided false evidence against plaintiff applicants in order to delay construction were insufficient to support § 1983 liability).

Avanru seeks refuge in the few cases from this Circuit where courts have entertained § 1983 claims in zoning disputes, but the facts of those cases provide no

---

[4] The exhibits to the complaint conclusively establish that the total time from application to approval was approximately 35 months, 27 of which are accounted for by the state court appellate process.

shelter. First, Avanru's invocation of Valentin v. Town of Natick, 707 F. Supp. 3d 88, 102 (D. Mass. 2023) — falls flat. There, the District of Massachusetts found that evidence of actual racial animus was sufficient to elevate the plaintiff's claims above the "run of the mill" zoning disputes contemplated in Creative Environments. Avanru seeks to analogize the racial animus that was key in Valentin to animus toward affordable housing, which it claims was evident in defendants' conduct and statements. As support for this factual allegation, Avanru highlighted the following quote from Johnson in its initial brief in opposition to the motion:

> I certainly wouldn't want it in my neighborhood, and I'd fight like hell to keep it out of my neighborhood . . . A couple of times you have said 'we are being treated differently.' I think that you have been treated differently!

Doc. no. 28 at 7. Even crediting arguendo the necessary analogy between racial animus and animus toward residents of 'subsidized' or 'low-income' housing, Avanru's allegation that such animus actually motivated any of the defendants is conclusory and is contradicted by the exhibits to the complaint. Rather than proving its point, Avanru's carefully constructed quote, placed back into context, strongly supports an incompatible inference—that Johnson opposed the project because she thought it was too big for the parcel given the surrounding neighborhood and was not an appropriate use of the land:

> **A couple of times you have said "we are being treated differently." I think you have been treated differently.** It's taken a long time, but this is quite a different project. And the size of this project, on the size of the lot that it's situated on, and in the area that it is situated, it's so different from anything else around there, and I think that's why it seems that you've been treated differently.

26

Doc. no. 1-29 (transcript of 12/15/22 Planning Board Meeting) at 35 (emphasis added to show portion of quote included in brief).

> The only thing I can say—and this is not my opinion—but this is why I don't think I can vote for this—because I am an elected member of the Planning Board. The people of Swanzey have elected me, and that's who I represent here. I don't represent me. I don't like the looks of the building, and **I certainly wouldn't want it in my neighborhood, and I'd fight like hell to keep it out of my neighborhood.** And it probably wouldn't make any difference, just like these people.
>
> But I am here to represent the Town of Swanzey that I care very much about. And I'd like to see things done in Swanzey that enhance its value, not something that is an enormous plot right in the middle of what we have. I don't know how to better say it. Maybe if I had time to think more about it, I would. But that's where I'm coming from. I can't vote for it.

Doc. no. 1-22 at 10 (transcript of 1/12/23 planning board meeting) (emphasis added). The immediate context of both quotations contradict Avanru's claim that Johnson "proudly admitted on the record" that she treated the project differently because it was income restricted. Doc. no. 28 at 7. Instead, that context conclusively shows that Johnson articulated her concerns with the project related to its size and location, and with how the proposed design fit into the surrounding neighborhood.

Avanru's claim that defendants exhibited an "incessant focus" on the issue of Section 8 housing is also conclusively contradicted by the meeting minutes and transcripts. Doc. no. 31 at 5. Review of the transcripts demonstrates that defendants' relatively infrequent mentions of Section 8 track closely with Avanru's own discussions of the topic. In fact, it was Avanru that first raised the topic of Section 8 housing, stating in the opening moments of its very first presentation to

27

the Zoning Board that the Airport Project would <u>not</u> be a Section 8 project. Doc. no. 1-1 at 6.

Avanru's emphasis on the Zoning Board's initial reference to Section 8 in the terms of the Airport Project's special use exception also fails to support a reasonable inference of animus. First, the record of the September 19 meeting, at which that condition was briefly discussed and adopted, conclusively demonstrates that it was inspired entirely by Avanru's own description of the project. Mulhearn, who proposed the condition language, did so by reading from the minutes of the April 20 meeting and directly quoting Avanru's own statement describing the nature of its proposal. Doc. no. 1-13 at 3. Far from evincing animus, Mulhearn's comments suggest an intent to hold Avanru to its own word. Further, the condition itself was not included in the final version of the special use exception approved at the conclusion of deliberations. Instead, the terms of the condition were amended at the behest of the Zoning Board itself, and with no prompting from Avanru, to remove the reference to Section 8. <u>Id.</u> at 6. Tellingly, neither Mulhearn nor any other member of the Board protested, or even commented on, this amendment. <u>Id.</u> And when the Zoning Board issued its written Notice of Decision, the terms of which actually set the operative conditions on the special use exception granted, the Notice contained no reference to income restrictions at all. Doc. no. 1-14.

Avanru's invocation of <u>Brockton Power LLC v. City of Brockton,</u> 948 F. Supp. 2d 48, 67-71 (D. Mass. 2013) is equally unavailing. Avanru makes much of its allegations that defendants, at times, acted against the advice of counsel, including by impermissibly considering the popularity of the projecting in denying zoning

28

approval, and (similarly) by denying planning approval for impermissible reasons relating to the potential impact of the Airport Project on property values. But while the Brockton Power court did indeed identify the defendants' defiance of counsel in that case as one factor supporting its finding that the plaintiffs had alleged sufficiently severe misconduct to clear the Creative Environments bar, it was only one of many such factors. The court noted that it was "not a case where the plaintiffs complain[ed] about one or two discrete permit denials or other obstructive acts that were subsequently remedied by state courts," but rather one where "repeated summary denial—or refusal to even consider—a series of applications . . . require[d] repeated resort to state courts to obtain relief." Brockton Power, 948 F. Supp. 2d at 68. Further, the court found that "[t]he systemic nature of defendants' refusal to provide any meaningful . . . process sets this case apart from those previously considered by courts in this jurisdiction, and suggests the defendants were not misinterpreting or misapplying the law, but were collectively determined not to follow it." Id. In addition to the sheer scope of resistance and frustration, which dwarfs the allegations Avanru advances here, the Brockton Power court identified additional indicia of injustice: namely, allegations that the defendants were denying the plaintiffs' applications in furtherance of their own personal interests. Id. at 69-70 ("The conscience-shocking nature of the alleged conspiracy as a whole is underscored by allegations that the defendants often acted against the advice of legal counsel, to further their own personal and political interests, and while knowing there was no legal justification for their actions."). Avanru asserts no such allegations here.

29

Finally, Avanru dedicates pages and pages of its complaint to detailed allegations regarding other housing projects (they claim were similarly situated) that allegedly "sailed through" the Swanzey zoning and planning process. Doc. no. 1 at 27. These allegations, according to Avanru, support its class-of-one equal protection claim, by demonstrating that Avanru was "intentionally treated differently from other[] similarly situated" property developers without any "rational basis for the difference in treatment." SBT Holdings, LLC v. Town of Westminster, 547 F.3d 28, 34 (1st Cir. 2008). Even accepting, however, that (1) the other projects were indeed similarly situated; (2) the other projects were indeed treated differently; and (3) there was no rational basis for the difference in treatment, Avanru's comparative allegations are still insufficient to state a class-of-one claim in the context of a zoning dispute because the First Circuit has imposed an additional requirement for class-of-one claims in the zoning context: the alleged disparate treatment must have been motivated by a "malicious or bad faith intent to injure." See SBT Holdings, 547 F.3d at 35.

Setting aside any other potential pitfalls for Avanru's class-of-one claim, this requirement is fatal. Even accepting all well-pled factual allegations as true, given both the specific statements made by the Individual Defendants, and their overall pattern of conduct, the court cannot reasonably infer that defendants acted out of a malicious intent to injure Avanru, rather than a good faith intent to do their duty for the town of Swanzey. This conclusion is especially clear upon consideration of the minutes of each hearing and the attached rulings that followed, which demonstrates a striking coherence between the concerns articulated by the

30

Individual Defendants and the legitimate (non-discriminatory) concerns raised by members of the public. If anything, the record shows that, while many members of the community did raise impermissible topics for zoning and planning consideration, such as Section 8 and the projects' proposed income restrictions, the Individual Defendants focused their questions on permissible concerns relating to the size of the structures relative to the plots, the designs of the structures, parking areas, and green spaces relative to the surrounding neighborhoods, and the impact that the projects would have on surrounding property values. Avanru chose to attach to its complaint all of the transcripts, meeting minutes, and rulings. Upon consideration of those attachments, the court cannot plausibly conclude that the defendants were motivated by an intent to injure.

For the foregoing reasons, Avanru fails to state a claim for relief under either Count I or Count II.

II.    In the Absence of any Viable Federal Claim the Court Declines to Exercise Jurisdiction Over the Remaining State Law Claims

In the First Circuit, "it is settled law that district courts may decline to exercise supplemental jurisdiction over pendent state law claims when the anchor federal claims for those state law claims are dismissed." Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 36-37 (1st Cir. 2020); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (abrogated by statute on other grounds) ("[W]hen the federal-law claims have dropped out of [a] lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."). Here, the

31

§ 1983 claims in Counts I & II were the only claims in the action arising under Federal Law, and the suit is in its early stages. Additionally, two aspects of this case weigh especially heavily in favor of exercising the court's discretion to dismiss the pendant state-law claims: (1) the same concern with allowing federal courts to become 'super zoning tribunals' that animated the entire preceding discussion also counsels the court to decline to exercise jurisdiction over this dispute in its entirety, and (2) the state-law claims, especially those contained in Counts III & IV, pose complex questions of state law that would be more appropriately answered by a state court.

For those reasons, the court will decline to exercise supplemental jurisdiction over the remaining state law claims and will dismiss Counts III-VII without prejudice. See Borrás-Borrero, 958 F.3d at 37 (instructing that in like situations supplemental state-law claims must be dismissed without prejudice).

## CONCLUSION

For the reasons explained above, defendants' motion to dismiss is hereby granted. Counts I & II are dismissed with prejudice. Counts III-VII are dismissed without prejudice.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 10, 2025
cc:    Counsel of Record

32

Add. 069

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Avanru Development Group, Inc.

    v.                                    Case No. 24-cv-103-LM-AJ

Swanzey, NH, Town of et al.


JUDGMENT


In accordance with the order by Chief Judge Landya B. McCafferty dated April 10, 2025, judgment is hereby entered.


By the Court:


/s/ Tracy A. Uhrin
Tracy A. Uhrin
Clerk of Court

Date: May 6, 2025


cc: Counsel of Record


Add. 070

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Avanru Development Group, Ltd. | ) |
| | ) |
| Plaintiff, | ) Civil Case No. 1:24-CV-103-LM-AJ |
| | ) |
| v. | ) |
| | ) |
| Town of Swanzey, NH Zoning Board, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**<u>NOTICE OF APPEAL</u>**

Notice is hereby given that Avanru Development Group, Ltd., plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the First Circuit from April 10, 2025 Order of the United States District Court for the District of New Hampshire granting defendants' motion to dismiss for failure to state a claim.

Respectfully submitted,

Avanru Development Group, Ltd.,

By its attorneys,

Sheehan Phinney Bass & Green, P.A.

Dated: May 8, 2025          By:  /s/ *James P. Harris*

Robert H. Miller (#13881)
James P. Harris (#15336)
1000 Elm Street
Manchester, NH 03105
603-627-8152
603-627-8145
rmiller@sheehan.com
jharris@sheehan.com

1

Add. 071

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice of Appeal to the United States Court of Appeals for the First Circuit was served on May 8, 2025, on all counsel of record through the Court's ECF system.


By:  /s/ *James P. Harris*
James P. Harris

2

Add. 072